772 So.2d 758 (2000)
STATE of Louisiana
v.
Scott P. WILKINSON
No. 00-KA-339.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 2000.
*760 Kevin V. Boshea, New Orleans, Louisiana, Attorney for Appellant Scott P. Wilkinson.
Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana, Thomas J. Butler Counsel of Record on Appeal, Terry M. BoudreauxAppellate Counsel, Joe AluiseTrial Counsel, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Appellee State of Louisiana.
Panel composed of Judges CHARLES GRISBAUM, Jr., EDWARD A. DUFRESNE, Jr. and JAMES L. CANNELLA.
CANNELLA, Judge.
Defendant, Scott Wilkinson, appeals from his conviction of simple rape and sentence of twenty years incarceration at hard labor. For reasons that follow, we affirm both the conviction and sentence.
Defendant was charged on January 28, 1998 with forcible rape of a juvenile in violation of LSA-R.S. 14:42.1. After various pre-trial matters, a jury trial was held on June 21 through 24, 1999, at the close of which the Defendant was found guilty of simple rape. A motion for post verdict judgment of acquittal was denied and Defendant was sentenced to twenty years incarceration at hard labor without benefit of parole, probation, or suspension of sentence, with credit for time served. Defendant filed a motion to reconsider his sentence, which was denied by the trial court. A subsequent motion for appeal was granted.

FACTS
On the afternoon of August 19, 1997, Barbara Coffman (Coffman) was driving down Manhattan Boulevard on the West Bank of Jefferson Parish on her way to pick up her children from school. She noticed a young girl on the opposite side of the street walking, sobbing uncontrollably and obviously in great distress. Coffman stopped to see if she could help and convinced the girl to get into her van. The girl told Coffman that she was walking home from school and had just been raped. Coffman comforted the girl and drove her home.
Coffman testified that the girl looked dazed and was "very, very upset" and "almost hysterical". The girl seemed lost and could not tell her exactly where she lived. She only knew that it was in Stone-bridge. Because the incident had just occurred, Coffman thought it advisable to get as much information about the perpetrator as possible, so she asked the girl questions. Coffman gave the information which she obtained to police the next day in a formal statement.
Coffman further testified that she found the girl's apartment and rang the doorbell. The girl's mother was home at the time. The girl was hysterical and went straight to her room where she "got up in a little ball on the floor". She then told her mother what had occurred.
Detective Jo Lynn Cummings, employed in the Personal Violence Unit of the Jefferson Parish Sheriffs Office, testified that she investigated the incident after she was notified that a fourteen-year-old girl had been raped.[1] When she arrived at C.C.'s home with two other detectives, there were several uniformed deputies on the *761 scene. C.C. was sitting on the floor in a fetal position, crying. Detective Cummings first spoke with C.C.'s mother and then with the deputies. Afterward, Detective Cummings and Detective Florida Bradstreet took C.C. into the bedroom and talked to her. C.C., who was still quite upset, told the detectives that a white male wearing a red polo type shirt and dark pants had raped her. She further described the perpetrator as having a slim build and some facial hair. She told the detectives that a Bell South truck was parked nearby.
Police officials contacted John Banquer, a twenty-five year employee and the head of security for Bell South, who identified the Defendant as the Bell South employee who was working in the area at the time of the rape. Company officials made arrangements to have the Defendant brought to the base station for identification. Detectives Cummings and Bradstreet drove C.C. into the Bell South parking lot where several people, including the Defendant, other employees and uniformed police officers, were standing. Detective Cummings explained that C.C. was sitting in the back seat and that the windows of the car were tinted, thus restricting the view from the outside. C.C. identified the Defendant as the perpetrator.
Detective Cummings testified that when she drove through the parking lot, C.C. hollered, "that's him, that's him". She became quite scared and had to be reassured that the Defendant could not see into the car. After the identification, C.C. was returned to her mother and taken to Children's Hospital for a physical examination.
The focus of Detective Cummings' investigation then shifted to the Defendant, who was taken to police headquarters. Detectives Bradstreet and Cummings advised the Defendant of his rights and took a taped statement. Afterward the Defendant was placed under arrest and taken to the Jefferson Parish Correctional Center. Defendant's clothes were taken as evidence and a body search was conducted. The police took samples of the Defendant's pubic hair, saliva and blood, which are necessary for the rape investigation.
Later C.C. was brought back to the scene of the crime, which Detective Cummings described as a wooded area. There is a smaller area, measuring about twelve feet square, surrounded by a wooden fence with a gate. Inside that area is a cross box belonging to Bell South. The ground inside the fenced area contains some grass and some cement, which is directly inside the gate. C.C. indicated that the rape took place inside this fenced area.
Detective Bradstreet testified that she accompanied Detective Cummings to C.C.'s home and assisted in the investigation. Her testimony is basically the same as that given by Detective Cummings.
Pamela Williams (Williams), a forensic scientist in the Jefferson Parish crime lab, was accepted by the trial court as an expert witness. She testified that she conducted the forensic investigation herein. She received a rape kit from the Defendant consisting of saliva, blood, fingernail scrapings and hair samples. She also received various items of clothing.
After testing for seminal fluid, hair or anything else unusual, she found nothing on the Defendant's shirt. However, she did find seminal fluid and spermatozoa on the short pants which the Defendant was wearing on the day of the rape. Testing of C.C.'s panties revealed a possible presence of blood and seminal fluid which further analysis was unable to confirm.
Williams also received a rape kit from C.C. taken at Children's Hospital, which contained a vaginal swab and a cervix swab. There was also a vaginal, cervix and intra-vaginal smear. Tests did not detect any seminal fluid on anything tested. Williams also testified that the lab report indicated that grass and other debris were found on C.C.'s stockings. She explained that she had no personal information on that test, because it was done by someone else in the crime lab.
*762 Julie Golden, a forensic scientist at Reliagene Technologies, a private dioxyribo-nucleicacid (DNA) analysis firm in New Orleans, testified that she received evidence in this case for analysis. Specifically, she received blood samples from both C.C. and the Defendant, a cutting from the Defendant's pants, and a tube of DNA, also taken from the Defendant's pants. An analysis of the fabric showed no sperm or epithelial cells. Analysis of the tube of DNA showed that it was consistent with the Defendant's DNA.
Banquer testified that his job is to investigate possible wrongdoing by Bell South employees. On the afternoon of August 19, 1997, he received a call from a coworker to determine if Bell South had a worker in the vicinity of the cross box on Manhattan Boulevard. A call to the dispatcher revealed that three employees were installing telephones in that area. Banquer obtained a description of the suspect from the police and eliminated two of the three because they were African-American. Banquer learned that the remaining employee was Scott Wilkinson, the Defendant herein. Banquer phoned the Defendant's supervisor and asked that the Defendant be detained until police could bring C.C. for identification. Banquer was informed that the police would have C.C. in the back seat of a car with tinted windows and would drive through the parking lot to save C.C. any further trauma.
Banquer drove to the Bell South office. Several employees, including the co-worker who had originally called him, were present in the parking lot. Banquer testified that it was time for Bell South crews to get off work and there were several employees walking around. He further testified that the employees wore uniforms, one of which is a red polo shirt. On that day most of the employees present, including the Defendant, were wearing red polo shirts.
On August 21, 1997, when the Defendant returned to work, Banquer interviewed him and took a written statement. The Defendant stated that he was working at the cross box when C.C. asked him how far it was to Stonebridge. The Defendant answered and C.C. left. Shortly afterward the Defendant was urinating when C.C. returned and again asked the distance to Stonebridge. Defendant's back was facing C.C. and she made no comment about the Defendant being exposed. She left again and the Defendant had no further contact with her. He denied the rape or any physical contact with C.C..
C.C., who was fourteen at the time of the incident, testified at trial that her parents divorced in the summer of 1997 and the night before the rape she had moved to Stonebridge Manor with her mother. Prior to the divorce her family lived in Lakeview and her father now lives in Metairie. C.C. explained that the divorce upset her and she became depressed. She was taking Prozac and spent some time immediately before the incident as an inpatient at DePaul Hospital.
August 19, 1997 was her first day at a new school. The day did not go well. Because of her depression, C.C. was wearing all black and was taunted by some of the students. During her last period, one of those students confronted her and made threats. The student pushed C.C. and hit her head on a locker. At the urging of other students in the area, the aggressor left and C.C. went to the school disciplinarian to lodge a complaint. By this time the school busses had left and C.C. attempted to walk home.
C.C. stated that she was carrying a backpack filled with books. She walked down Manhattan Boulevard because she recognized some of the stores along the street. She noticed the Defendant and the Bell South truck on the corner, but continued walking. She later noticed the Defendant and the truck at a fenced-in utility box nearby. Defendant was inside the fence and the gate was open. She decided to ask directions. She entered the gate *763 and said "excuse me, sir but do you know how far off Stonebridge Manor is". Defendant turned around and faced C.C. His penis was exposed and he was masturbating. C.C. stated that she was shocked and scared. Defendant walked up to C.C. and said "I hope you don't mind me doing this." At that point he grabbed C.C. pulled her inside the fenced area and threw her on the ground. C.C. testified that Defendant removed her stockings and underwear, and pulled up her shirt. Then he put his penis inside her vagina, but did not ejaculate. He got off her and continued to masturbate. Subsequently, he zipped up his pants and opened the gate and left.
C.C. testified that throughout the rape she had a heavy backpack which restricted her movement. Also, she was very frightened and shocked. When C.C. heard the van pull off, she dressed and left the area. She was crying and walking down Manhattan toward a store, where she intended to use the telephone. A lady in a van pulled up and asked what was wrong. C.C.'s testimony recaps the testimony given previously by Coffman as she recounted the ride home. Further, C.C. testified to the events following her return home, which is consistent with that given by the two police detectives. C.C. identified the Defendant as the perpetrator.
C.C. testified to the effects the rape had on her life. She stated that she was very upset and has received counseling. She is now trying to move on and put the ordeal behind her.
The trial court also heard testimony from Dr. Lucinda McCaslin, a pediatrician employed in the emergency room of Children's Hospital in New Orleans. She testified that she examined C.C. on the afternoon of August 19, 1997. Dr. McCaslin stated that C.C. was very upset. The doctor reassured her and convinced her to relate what happened. C.C. described to Dr. McCaslin the details of the rape, which are consistent with her testimony.
Dr. McCaslin first conducted a physical exam for trauma. She found a fresh bruise over C.C.'s tailbone. An examination of the genital area revealed a laceration about one-half inch in length at the perineum, the bottom of the hymen. Dr. McCaslin testified that such a tear is typical in sexual penetration and is consistent with the report of rape. The tear was fresh. It was still moist and red and had not begun to heal.
Dr. McCaslin also conducted an examination for forensic evidence. She found no evidence of semen on C.C.'s body. Because C.C. has a very small vaginal opening and appeared to be virginal, Dr. McCaslin did not do an actual speculum exam. Instead, she used a small swab inserted into the vagina, as is customary when there is a report of penetration. No evidence of sperm was found. The doctor also took hair and blood samples for forensic tests and potential diseases. C.C.'s clothes were sealed in a plastic bag and given to the police as evidence. Dr. McCaslin's report concluded that the physical examination findings collaborate C.C.'s report of vaginal penetration and being thrown on the ground.
The Defendant testified at trial. He stated that he was working for Bell South on August 19, 1997 on the corner of Manhattan and Lapalco Boulevard on the West Bank of Jefferson Parish. A girl approached him and asked the distance to Stonebridge Manor. The Defendant testified that he had never seen the girl before and simply told her that she was going in the right direction and she left. The Defendant continued his work. When he realized he was at the wrong location, he moved to the fenced area where the cross box was located. He began to urinate in the weeds, as he zipped up his pants he turned to see that the girl had returned, looking exhausted. She asked again how far it was to Stonebridge Manor. He told her to continue down Manhattan and she would find it. She turned and walked off.
*764 The Defendant denied any physical contact with the girl. Specifically, he denied grabbing her, throwing her to the ground and raping her.

LAW
On appeal, the Defendant assigns eight errors by the trial court, which are as follows:
1. The verdict is contrary to the law and the evidence.
2. The trial court erred in the denial of the motion for new trial.
3. The trial court erred in the denial of the motion for judgment of acquittal.
4. The trial court erred in refusing to admit into evidence hospital records of the mental history of C.C..
5. The trial court erred in refusing to admit into evidence the excerpts of the statement taken from C.C..
6. The trial court erred in the admission of DNA evidence in the trial.
7. The trial court erred in the imposition of the sentence of twenty years incarceration at hard labor.
8. The trial court erred in the denial of the motion to reconsider sentence.
The Defendant's first three assignments of error address the question of whether the evidence used to convict him was sufficient. It is important to note that this argument is different from those made in the trial court on the motions for new trial and for judgment of acquittal. In the trial court, the Defendant based the new trial motion on the argument that the State improperly referred to facts which were not in evidence in its closing argument. The motion for judgment of acquittal was based on the fact that C.C.'s physical condition did not support her version that she was attacked on a surface of branches and concrete.
In brief to this court, the Defendant argues that a new trial or judgment of acquittal should have been granted because the trial court erred in including the responsive verdict of simple rape in the jury instructions. Also, he argues that the evidence was not sufficient to support a conviction of simple rape because the elements of simple rape were not proven. Specifically, there was no showing of unsoundness of mind, stupor, or abnormal condition of the mind, or the belief that the Defendant was C.C.'s husband. Thus, the Defendant argues, the trial court should have excluded both simple rape and attempted simple rape from the jury's consideration.
The Defendant was charged with forcible rape in violation of LSAR.S. 14:42.1 which reads in pertinent part as follows:
A. Forcible rape is rape committed when the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.
LSAR.S. 14:43 defines simple rape as:
A. Simple rape is a rape committed when the anal or vaginal sexual intercourse is deemed to be without the lawful consent of a victim who is not the spouse of the offender because it is committed under any one or more of the following circumstances:
(1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause, other than the administration by the offender, and without the knowledge of the victim, *765 of any narcotic or anesthetic agent or other controlled dangerous substance and the offender knew or should have known of the victim's incapacity.
(2) When the victim is incapable, through unsoundness of mind, whether temporary or permanent, of understanding the nature of the act and the offender knew or should have known of the victim's incapacity.
(3) When the female victim submits under the belief that the person committing the act is her husband and such belief is intentionally induced by any artifice, pretense, or concealment practiced by the offender.
LSAC.Cr.P. article 814 A 10 makes simple rape a legislatively authorized responsive verdict to forcible rape.
Initially, we note that the Defendant did not object to the jury charges at trial, and did not make this argument in post conviction motions. Although the Defendant did not raise the issue of sufficiency of evidence for proof of the elements of simple rape in his motion for judgment of acquittal, such failure does not necessarily preclude review of that issue. State v. Fontana, 396 So.2d 1251, 1252 (La.1981).
The Defendant is correct in his contention that there is no evidence to prove the elements of simple rape. There is no showing that C.C. was incapable, through unsoundness of mind, whether temporary or permanent, of understanding the nature of the act and the offender knew or should have known of C.C.'s incapacity. Further, there is no evidence that C.C. submitted under the belief that the person committing the act was her husband. However, that does not end our inquiry.
In support of his position, the Defendant cites State v. Henry, 439 So.2d 1242, 1249 (La.App. 5th Cir.1983). In that case this court held that the trial judge correctly excluded the charge of forcible rape in the prosecution for aggravated rape. This court reasoned that forcible rape was not a true lesser included offense to aggravated rape and there was no evidence of force necessary for the offense of forcible rape. The Defendant argues that the trial judge should have removed the responsive verdict of simple rape because all of the elements of simple rape are not included within the definition of forcible rape and none of the evidence adduced at trial proves the elements of simple rape.
Defendant relies on State v. Dauzat, 392 So.2d 393, 396 (La.1980) for the proposition that when the definition of the greater crime does not necessarily include all of the elements of the lesser, the court determines whether there is any evidence to support the conviction for the lesser offense even though it is a legislatively designated responsive verdict. He argues that appellate courts have disapproved of legislatively provided responsive verdicts which offend a constitutional principle.
The Defendant notes that, in State v. Porter, 93-1106 (La.7/5/94), 639 So.2d 1137, 1141, the court concluded that because article 814 contains authorized responsive verdicts which are not truly lesser and included offenses, evidence which is sufficient to support a conviction of the charged offense may not support all of the elements of the responsive offense. The Defendant states that nothing in Porter, supra, nor in Louisiana law, eliminates the necessity for sufficiency of the evidence. Thus, he argues that simple rape is not a truly lesser and included offense to the crime of forcible rape and the elements of the crime of simple rape were not established at trial.
Defendant's reliance on Dauzat, supra is misplaced. In Dauzat, the court reversed a conviction for aggravated battery, a legislatively authorized responsive verdict to attempted murder, because the evidence was insufficient to support aggravated battery, although it was sufficient to support the charged offense. Id. 393 So.2d at 396. However, the Louisiana Supreme Court later adopted a different approach in State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251-252 (La.1982), cert. denied, 461 U.S. *766 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). Considering the newly amended article 814, the court held:
.... even if the offense is legislatively designated as responsive by Article 814, the defendant may timely object to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict. If the court overrules the objection and the jury returns a verdict of guilty of the responsive offense, the reviewing court must examine the record to determine if the responsive verdict is supported by the evidence and may reverse the conviction if the evidence does not support the verdict. However, if the defendant does not enter an objection (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.
It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object. Therefore, at least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.
(Footnotes omitted)
Id. 424 So.2d at 251-252
Accordingly, as here, when the Defendant fails to timely object to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. Thus, the Defendant is entitled to a reversal of his conviction only if the evidence is insufficient to support a conviction of the charged offense, forcible rape.
In State v. Richardson, 425 So.2d 1228, 1231 (La.1983), the Louisiana Supreme Court set forth the burden of proof for a charge of forcible rape as follows:[2]
Accordingly, in Louisiana, to prove a charge of forcible rape, the state has the burden of proving that (1) anal or vaginal intercourse occurred; (2) without the lawful consent of the victim; (3) the victim's resistance is prevented by force or threats of physical violence; and (4) the victim reasonably believes that such resistance would not prevent the rape.
The evidence offered by the State shows that the Defendant forcibly grabbed C.C., threw her to the ground, pushed down her clothing, laid on top of her and penetrated her vaginally several times. C.C., a fourteen-year-old, was frightened, weighted down by the backpack and did not know whether any action on her part would have caused him to do additional harm. She was thrown into a secluded area and could have reasonably believed that screaming would be futile.
Similar testimony from Coffman, police officers, and Dr. McCaslin, confirm that C.C. was extremely upset, but consistent, when relating the details of the incident. *767 Further, medical evidence showed that C.C. sustained a tear at the bottom of the hymen consistent with attempted penetration.
The jury apparently believed C.C.'s version of the incident. It is not our function to assess credibility or re-weigh the evidence. Appellate review for constitutional sufficiency of evidence is a limited one restricted by the standard developed in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965, 968 (La. 1986). The Jackson standard requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. Id.
Given the facts presented at trial, we find the evidence sufficient to support the elements of forcible rape. Therefore, we find no merit in these assignments of error.
In the fourth and fifth assignments of error, the Defendant argues that the trial court erred in refusing to admit certain evidence, specifically medical records regarding the mental history of C.C. and excerpts of the statement of C.C. to police officers.
The Defendant contends that the allegation of forcible rape was a "manipulative fabrication on the part of a young lady who was suffering from significant personal problems". To support that theory at trial, the Defendant sought to introduce the medical records of C.C.'s hospitalization at East Lake Hospital and excerpts from a prior statement made by C.C. to police officers.
The Defendant argues that the medical records are essential to his defense because they show the prior mental history of C.C., including a prior suicide attempt and her "manipulative" nature. Further, the Defendant argues that certain parts of the statement should have been allowed into evidence because the credibility of C.C. is at issue. We have reviewed the matter and find no error in the trial court's refusal to allow either item into evidence.
As to the medical records, the State argues they were not authenticated and the Defendant offered no witnesses to serve that purpose. The Defendant does not answer that issue, but simply argues that the records were obtained pursuant to a valid Subpoena Duces Tecum.
At the trial, C.C. admitted that she received psychiatric treatment for depression, was on Prozac at the time of the incident, and was hospitalized shortly before the incident for depression. That was verified by Detective Cummings, who testified that C.C. made those statements to the police. When the Defendant questioned C.C. about whether she recalled the diagnosis, the State objected to the relevance of the question, and the trial judge overruled the objection. Defendant was permitted to ask C.C. if she made statements to hospital personal that her mother was physically, mentally and emotionally abusive, and once banged her head against a headboard.
The Defendant attempted to admit the hospital records under the business records exception to the hearsay rule. See LSAC.E. art. 803(6). The State argued that the records were not properly authenticated and could not be admitted.
Authentication is required as a condition precedent to admissibility. LSA-C.E. 901(A). LSAC.E. article 901 B(1) through (10) provide examples of authentication which conform with this article. Article 901 B(10) is applicable here. That portion of the article provides for "(a)ny method of authentication or identification provided by Act of Congress or by Act of the Louisiana Legislature."
LSAR.S. 13:3714 governs the conditions precedent for admission of medical *768 records from private hospitals. 13:3714 as it read at the time of trial[3] provided:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the record is sought to be used may summon and examine those making the original of said record as witnesses under cross-examination.
In State v. Trahan, 332 So.2d 218, 220 (La.1976), the court explained that, because the medical records rule is an exception to the hearsay rule created by statute, it is essential that all of the formalities prescribed in the statute be followed before such records are admissible in evidence. After finding that the records which the Defendant sought to introduce were not certified by any of the authorities named in the statute, the Trahan court concluded the records did not qualify for introduction under the hospital records exception to the hearsay rule and that the trial court correctly sustained the State's objection to their admission. The Trahan court further concluded that, based on the evidence presented, no great prejudice was suffered by the defendant because of his inability to introduce the medical records in question. See also, State v. Day, 00-64, p. 8 (La.App. 5th Cir. 5/30/00), 762 So.2d 264, 268, wherein this court held medical records were improperly admitted at trial since the proper party did not sign or verify the records as required by LSA R.S. 13:3714.
The records sought to be introduced here recite that they were certified by a supervisor in Health Information Management, rather than the administrator or medical records librarian as required by the above statute. Thus, we find they were properly excluded.
Further, we note that the Defendant suffered no prejudice as a result of the trial court's refusal to admit the hospital records. In brief to this court, the Defendant argues that the evidence he intended to introduce though the medical records was as follows:
1. Prior mental history
2. Treatment with Prozac
3. Mental problems resulting in hospitalization, including a suicide attempt
4. A manipulative nature
5. Repeated hospitalizations
6. Treatment for depression
7. Mental illness which affected her behavior at school and probably at home.
We have reviewed the testimony offered at trial and find that the Defendant was permitted to present evidence to support his claim that C.C. was manipulative and likely to fabricate the story of a rape. We believe that the Defendant was allowed to bring in the evidence that he sought to show by the medical records through the testimony of C.C. and her mother. C.C. admitted being hospitalized for depression and taking Prozac. C.C. denied saying that her mother was abusive, but did admit her mother slapped her in the face. C.C. also stated that her father was physically abusive and admitted a suicide attempt while living with her father. She also *769 admitted cutting herself several other times while living with her father. Her mother provided further testimony regarding C.C.'s mental and behavioral problems.
We see no prejudice to the Defendant by the trial court's refusal to admit the records. The jury heard live testimony regarding C.C.'s history of depression and personal problems including self-mutilation and suicidal tendency. Accordingly, we find no merit in this argument.
The next assignment of error relates to the defense attempt to introduce portions of the statement that C.C. made to police officers. The Defendant argues that this evidence went directly to the credibility of C.C. and was necessary to his defense. He argues that the failure of the court to allow portions of the statement into evidence denied him a fundamental right to present his defense and that such an error cannot be harmless.
Detective Mike Hullihan testified that he went to the hospital on the evening of the incident and took a taped statement from C.C. The Defendant does not specify which portions of the statement he would have introduced.
Prior to C.C.'s testimony, the trial judge was provided with the statement for the purpose of determining whether there was anything in the statement which was inconsistent with her testimony. After the Defendant testified at trial, he requested the trial judge to conduct an in camera inspection of C.C.'s statement to determine admissibility. That request was granted.
The record shows that the Defendant was allowed to question C.C. extensively regarding alleged inconsistencies between the trial testimony and the prior statement given to police. At the end of the testimony, the Defendant sought to introduce the actual statement. The trial judge disallowed the introduction, reasoning that C.C. had previously testified to the contents, but he did allow the Defendant to proffer the statement.
The State argues that the excerpts were properly used as impeachment evidence and that the trial judge properly excluded the hearsay evidence. Further, the State argues that the pertinent questions and answers were made part of the record through C.C.'s live testimony.
We have reviewed the proffered evidence and find that the trial judge was correct in ruling that the witness testified to the contents of the statement showing the alleged inconsistencies. Although the jury did not review the actual statement, it heard the alleged inconsistent portions.
The inconsistencies were the description of Defendant's pants and the description of the enclosed area where the rape occurred. During cross-examination, defense counsel asked C.C. to describe the type of pants worn by the Defendant. She testified that she did not recall. She did recall giving a previous statement to Detective Hullihan regarding a description of the clothing. C.C. remembered telling the officer about the red Bell South shirt and giving a description of the perpetrator's face. After being provided with a copy of her statement to refresh her memory, C.C. stated that according to her prior statement she said the perpetrator was wearing long blue jeans. She admitted that she probably said that. It was shown that the Defendant was wearing navy blue shorts on the day of the incident.
On redirect examination C.C. testified that, at the time of the rape, she was focusing on the attacker's face, shirt and exposed penis. She did not take time to observe and remember the type of pants he was wearing.
C.C. also testified that the area where she was raped consisted of concrete and twigs. During cross-examination defense counsel asked whether C.C. recalled giving a prior statement to Detective Hullihan regarding whether she was attacked on grass or on concrete. She did not recall her prior answer.
*770 C.C. referred to her statement and responded that she previously told the officer that the area was "all a grassy area" and there was no cement. She further testified that she previously told the officer that she was thrown down on the grass. C.C. testified at trial that she was thrown down on concrete which was covered with twigs. She explained that she may have been confused because the area around the utility box was completely grassy, but the area inside the fence contained some cement.
LSAC.E. art. 613 provides:
Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.
Thus, the statement would only be independently admissible if C.C. had not admitted the inconsistent statements. State v. Jarvis, 97-1174, (La.App. 5th Cir. 4/9/98), 710 So.2d 831, 835, writ denied, 98-2219 (La.1/8/99), 734 So.2d 1222. However, at trial, when confronted with the prior statements, she admitted making inconsistent statements. In State v. Jackson, 31,433, p. 18 (La.App. 2nd Cir. 1/20/99), 726 So.2d 1061, 1073, writ denied, 99-2250 (La.12/17/99), 751 So.2d 876, the court ruled that when, as in the instant case, C.C. freely admitted making false statements, the actual statement is unnecessary and inadmissible.
Since the Defendant was allowed to question C.C. regarding alleged inconsistencies between her prior statement and trial testimony, the admission of the written statement would only be cumulative. The possible inconsistencies, which the defense sought to elicit, were provided through C.C.'s live testimony.
We find that, as in Jarvis, supra, there is no reasonable probability that the exclusion of the evidence in question might have contributed to the conviction considering the strength of the evidence presented to prove forcible rape. Further, the Defendant was not prejudiced by the exclusion since the jury heard C.C. admit the inconsistencies. Accordingly, we find no merit in this argument.
In the sixth assignment of error, Defendant argues that the trial court erred in the admission of DNA evidence. On appeal, Defendant argues the trial judge should have conducted a pretrial hearing on the admissibility of DNA evidence in accordance with the standards expressed in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
We find that the Defendant is precluded from bringing this argument to this court since he allowed the evidence to be introduced without objection at trial. LSAR.S. art. 841 A. Additionally, defense counsel stipulated to the expertise of the expert who presented the DNA evidence at trial. Accordingly, we will not address the merits of this argument.
In the final two arguments, the Defendant argues that his sentence is excessive. He filed a motion to reconsider the twenty-year sentence imposed by the trial court after the conviction. In response, the State argues that the sentence is not excessive since the Defendant preyed on a child and caused pain and suffering to C.C. and her family.
The sentencing exposure for simple rape is imprisonment with or without hard labor, without benefit of parole, probation, or suspension of sentence for a maximum of twenty-five years. LSAR.S. 14:43 C. The Defendant was sentenced to twenty years incarceration at hard labor with the statutory restrictions. Thus, although the Defendant did not receive the maximum, his sentence is in the upper range of the exposure. LSAC.Cr.P. art. 881.1 D provides *771 that the failure "to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review".
Here, the Defendant filed a motion to reconsider an excessive sentence, but did not state the grounds on which it was based. In brief to this court, he argues that the trial judge failed to consider mitigating factors or the Defendant's lack of prior felony convictions. In State v. Mims, 619 So.2d 1059 (La.1993) the Louisiana Supreme Court ruled that, while article 881.1 precludes the defendant from presenting arguments to the court of appeal which were not presented to the court at a point in the proceedings when the trial court was in a position to correct the deficiency, it does not preclude the court from considering the bare claim of excessiveness. Thus, we will review only the bare claim of constitutional excessiveness.
This court in State v. Stec, 99-633 (La. App. 5th Cir. 11/30/99), 749 So.2d 784, 789 this court explained:
The Eighth Amendment to the United States Constitution and Article 1 § 20 of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739 (La.1992); State v. Munoz, 575 So.2d 848 (La.App. 5th Cir.1991); writ denied, 577 So.2d 1009 (La.1991). The trial judge has wide discretion in imposing sentences within the statutory limits, and sentences will not be set aside as excessive absent manifest abuse of that broad discretion. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Riche, 608 So.2d 639 (La.App. 5th Cir.1992), writ denied, 613 So.2d 972 (La.1993).
Here, the trial judge evidently attached great weight to C.C.'s testimony and apparently considered that she was a vulnerable juvenile who had a history of depression before the rape and suffered trauma from the rape. C.C. asked directions from the Defendant who worked for a company with the indicia of trustworthiness. She testified that she was unable to trust anyone after this incident. The emotional damage to C.C., who had a history of depression coupled with the forcefulness of the rape, brings us to the conclusion that the trial court did not abuse its discretion in the sentence imposed upon the Defendant. This assignment is without merit.
This court has conducted an errors patent review pursuant to LSAC.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La. 1975). Upon review we have found two such errors.
First we note that the commitment/minute entry does not indicate that the jury was sworn as required by LSA C.Cr.P. arts. 788 and 790. However, no mention of jury irregularities was raised in the trial court or on appeal. Therefore, consideration of that issue is waived. Further, we find no prejudicial error. State v. Wallace, 612 So.2d 183, 186 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1253 (La. 1993).
Second, we find that the transcript shows that the trial court informed the Defendant that he had three years after his sentence and conviction became final to file for post-conviction relief. The amended commitment/minute entry recites that the trial judge informed the Defendant that he had two years after the judgment of conviction and sentence became final to seek post-conviction relief. When there is a discrepancy between the transcript and the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). On the date of sentencing, August 6, 1999, the prescriptive period was three years. By 1999 La. Acts. No. 1262, effective August 15, 1999, the prescriptive *772 period was shortened to two years. This court has given that newly-shortened period retroactive application. State v. Boles, 99-662, (La.App. 5th Cir. 11/30/99), 750 So.2d 1059. Since Defendant's conviction and sentence will become final after the newly-enacted shortened period, the trial judge is instructed to inform the Defendant of the amended provisions of this article by sending appropriate written notice to him within ten days of this court's opinion and to file written proof in the record that the Defendant received such notice. State v. Williams, 98-651 (La.App. 5th Cir. 2/10/99), 729 So.2d 14.
AFFIRMED WITH ORDER.
NOTES
[1] Because the victim is a juvenile, we will refer to her in this opinion as C.C.
[2] The former article, prior to the 1997 amendment, was essentially identical to current law. It read: A. Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

The 1984 amendment only changed the penalty provision. Thus, State v. Richardson is applicable.
[3] 1999 La. Acts, No. 1261 § 1, effective August 15, 1999, rewrote this section as follows: Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or a copy of a bill for services rendered, medical narrative, chart, or record of any other state health care provider, as defined by R.S. 40:1299.39(A)(1) and any other health care provider as defined in R.S. 40:1299.41(A)(1), certified or attested to by the state health care provider or the health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.