# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 17-293

STATE OF LOUISIANA

VERSUS

NATHANIEL CLIMES THIBEAUX

AKA NATHANIEL THIBEAUX

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 152704
HONORABLE DAVID MICHAEL SMITH, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and Candyce G. Perret, Judges.

**VERDICT MODIFIED IN PART AND AFFIRMED IN PART; JUDGMENT OF CONVICTIONS ON TWO COUNTS OF FORCIBLE RAPE AND ONE COUNT OF SEXUAL BATTERY ENTERED; SENTENCES VACATED AND REMANDED FOR RESENTENCING.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**Telephone: (337) 436-2900**
**COUNSEL FOR:**
    **Defendant/Appellant - Nathaniel Climes Thibeaux aka Nathaniel Thibeaux**

**Keith A. Stutes**
**District Attorney – 15th Judicial District**
**P. O. Box 3306**
**Kenneth P. Hebert**
**Assistant District Attorney – 15th Judicial District**
**Lafayette, LA 70502-3306**
**Telephone: (337) 232-5170**
**COUNSEL FOR:**
**Plaintiff/Appellee - State of Louisiana**

**THIBODEAUX, Chief Judge.**

Defendant Nathaniel Climes Thibeaux was convicted by a jury of three counts of aggravated rape of H.A. (DOB 2/14/01),[1] violations of La.R.S. 14:42(A)(1), and six counts of aggravated crimes against nature of H.A., violations of La.R.S. 14:89.1(A)(2)(a). The trial court sentenced Mr. Thibeaux to life at hard labor without the benefit of probation, parole, or suspension of sentence for each count of aggravated rape, to run concurrently with each other. The trial court also sentenced Mr. Thibeaux to ten years without benefit of probation, parole, or suspension of sentence for each count of aggravated crime against nature, to run concurrently with each other but consecutively to the three counts of aggravated rape. Mr. Thibeaux now appeals his conviction to this court. For the reasons that follow, we modify the verdict and render a judgment of conviction of the lesser included offense of forcible rape on counts one and two and of the lesser included offense of sexual battery on count three. We remand for resentencing on these counts.

## I.

### ISSUES

We must decide:

(1)    whether the assistance of counsel provided to Mr. Thibeaux fell below that guaranteed by the Sixth Amendment of the Constitution of the United States;

(2)    whether the evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560

---

[1] In accordance with La.R.S. 46:1844(W), we will refer to the victim by her initials only in order to protect her identity.

(1979) standard, was insufficient to prove beyond a reasonable doubt that Mr. Thibeaux committed aggravated rape of H.A.; and

(3)     whether Mr. Thibeaux's convictions for both three counts of aggravated rape and three counts of aggravated crimes against nature involving sexual intercourse are in violation of the Fifth Amendment's prohibition against double jeopardy.

II.

**FACTS AND PROCEDURAL HISTORY**

Mr. Thibeaux is accused of nine separate acts of sexual misconduct, including sexual intercourse, with his thirteen to fourteen-year-old stepdaughter, H.A., that occurred over a ten-month period between August 2014 and June 2015. The State presented the details of the various crimes to the jury through H.A.'s testimony, her videotaped Hearts of Hope interview, and the report made during her sexual assault examination.

At trial, H.A. testified that the first time Mr. Thibeaux molested her was in August 2014 right before school started. She explained how she was awoken from her sleep when she felt Mr. Thibeaux touching her breasts and vagina, both above and underneath her clothes. This occurred in her bedroom at the apartment she lived in with her mother and stepfather. H.A. also told of another time when her mother almost caught Mr. Thibeaux molesting her in her bedroom:

> She came inside, she came into my room and he was in my room. And he just jumped off the bed and he pretended he was praying. He said he was praying with me or something. And then she got really angry. Then she went in the living room. And he told me to hurry up to put on my clothes and then he left and went meet her in the other room.

When her mother asked if Mr. Thibeaux had touched her, H.A. told her mother that he had not because, she explained, Mr. Thibeaux had told her to say "no" if her mother ever asked such a question.

Sometime around November 2014, the family moved from the apartment into a house. H.A. testified that, about a week or two after the move, Mr. Thibeaux told her to go sleep on the sofa in the living room. After her mother fell asleep, he came into the living room, took off H.A.'s pants, touched and licked her breasts and her vagina, and then "put" his penis into her vagina. She further explained:

> The first time he did it, he used a condom. And then he would try to whip me and I would go screaming. Well, I didn't really scream but I thought, you know, it would make him a little nervous so I started making little noises. And he would tell me, "It's all right. You can do anything with me but don't say anything. And I would move my legs and he would try to move them down."

In her recollection of that sexual encounter, H.A. also described a separate time when Mr. Thibeaux instructed her to open her legs, applied vaseline to her vagina, and then penetrated her vagina with his penis. After a while, he ejaculated on her stomach and "wipe[d] it off with a towel." She explained that she did not try to push Mr. Thibeaux off because she "was afraid that he might do more than that." She decided to "just face[] it."

When asked if there was ever a time that Mr. Thibeaux "put" his penis anywhere else, H.A. spoke of when she was in the living room on the phone with her boyfriend and Mr. Thibeaux got on the sofa, pulled off her pants, pulled down his pants, and penetrated her vaginally with his penis. After she told him to stop, Mr. Thibeaux "put" his penis in her anus. Although she tried to stop him, "he kept

3

holding [her] down. After a while he just did it." At trial, she stated that was the only time Mr. Thibeaux "put" his penis "in her butt."

The State then asked H.A. whether there was any other time "where he had sex with you and you resisted him." In response, H.A. told of when her mother left to pick up her brother from Breaux Bridge Highway. H.A. had just taken a shower when Mr. Thibeaux came into her room naked and told her to hurry up before her mother came back. He then had vaginal intercourse with her. H.A. testified that the last time Mr. Thibeaux had sex with her was in her room on June 8, 2015.

When asked if Mr. Thibeaux ever did anything to her other than sex, H.A. stated that he would touch her "on the outside" and make her touch his penis. She recalled a time when "[h]e was in the living room and he had pulled me down. He had pulled his pants down and he said something and then I was crying and he told me to hurry up and do it, to touch him." Questioned whether she did as he directed, H.A. responded: "Yes. After all that, he had stopped and I started crying." Overall, H.A. testified that Mr. Thibeaux molested her over fifteen times in the living room of the family home and about that many times in her bedroom.

H.A. explained that she was too afraid to tell—afraid she would never see her mother happy again if she told—because her mother loved Mr. Thibeaux so much. She also stated that she was "really afraid and . . . didn't know what else would happen, that he could do something else like abuse, so I didn't do anything." H.A. further testified that Mr. Thibeaux threatened that she would not be able to see her boyfriend if she ever told anyone and that he told her to have sex with her boyfriend. But, on June 9, 2015, when her mother's brother finally asked her outright if Mr. Thibeaux was molesting her, H.A. explained that she felt

comfortable telling both her uncle and her mother the truth because her mother was mad at Mr. Thibeaux. In fact, from Mr. Thibeaux's testimony, it was revealed that H.A's mother had kicked Mr. Thibeaux out of the family dwelling earlier that day. That night H.A. was taken to Our Lady of Lourdes Hospital (OLOL), where a sexual assault examination was performed. While no outward signs of trauma were noted, DNA was collected from the panties she was wearing as well as from the fitted sheet that both H.A. and her mother testified was placed only on H.A.'s bed.

H.A. then recounted for the jury an incident that occurred after she had been removed from her mother's care. She recalled that her mother picked her up and brought her to Burger King where Mr. Thibeaux met them. When he approached the vehicle, H.A. started crying. Both her mother and Mr. Thibeaux then tried to get her to recant and say she was only having sex with her boyfriend, not her stepfather.

On cross-examination, defense counsel asked H.A. whether she screamed, yelled, kicked, or did any of those things when Mr. Thibeaux came into her room that first time to which she responded in the negative. Defense counsel then asked if she was hurting when she went to the hospital to which she replied that she was not hurting, scratched, bruised, or bleeding. H.A. also admitted that she initially denied that Mr. Thibeaux had touched her when asked by her uncle, and she further admitted that she would often voluntarily go to the store with Mr. Thibeaux and even asked to go with him.

H.A. acknowledged that she never told her mother what her stepfather was doing to her and never screamed for her mother. And even though she was on the phone with her boyfriend during one of the rapes, she did not tell him that she

5

needed help. She knew her boyfriend's mother well but did not tell her anything, and she saw her uncle several times a month but did not tell him either. Although H.A. went to a counselor once a week during this time, H.A. did not speak to the counselor about what her stepfather was doing to her. In fact, she told the counselor that she liked Mr. Thibeaux and that everything in the house was fine.

Her counselor, Mary Smith, testified, however, that she observed H.A. with Mr. Thibeaux, and while he was "very affectionate with her[,]" H.A. was "very withdrawn." Ms. Smith recalled one instance in which her receptionist called her into the waiting area to observe Mr. Thibeaux's inappropriate "caressing" of H.A.: "he would sit by her and he would kind of caress her hair; very attentive. In sessions as well, he would be informative." When Ms. Smith asked H.A. about her relationship with Mr. Thibeaux, H.A. would withdraw and shut down. But Ms. Smith conceded, on cross-examination, that H.A. never told her of the alleged sexual molestation and she never saw any telltale signs of sexual molestation, which, by law, she would have been mandated to report.

The State then played for the jury the video of H.A.'s Hearts of Hope interview, conducted on June 16, 2015. When asked why she was being interviewed, H.A. stated that she had been raped by her stepfather. She explained that Mr. Thibeaux started "messing with her all of a sudden" in August of the previous year and touching her almost every night. In November, Mr. Thibeaux started raping H.A. The last day Mr. Thibeaux raped H.A. was on Monday of the previous week. H.A. also described the Burger King incident when she and her mother saw Mr. Thibeaux.

When asked to remember a specific time in August that Mr. Thibeaux touched her, H.A. told the interviewer that the first night, after she had fallen

6

asleep, she felt fingers all over her body. She woke up scared, and Mr. Thibeaux told her to be cool and be quiet. She put the covers over her head and went back to sleep. H.A. said that Mr. Thibeaux touched her breasts and her vagina over and underneath her clothes and then went to bed.

In her discussion of that incident, H.A. described another night when Mr. Thibeaux scared her by taking off her clothes and "licking" her vagina. Her mother "almost caught him" when she walked in, but Mr. Thibeaux hurriedly put the covers back on H.A., pretending he was praying with her. H.A.'s mother left the room mad. Mr. Thibeaux went to talk to H.A.'s mother and eventually called for H.A. He asked H.A. if he ever touched her, and H.A. said "no" because that is what Mr. Thibeaux told her to say.

The interviewer reminded H.A. that she said Mr. Thibeaux began raping her in November. H.A. stated that she remembered it being November because that was when they moved into their house. Around the fifth day after they moved into the house, Mr. Thibeaux went to H.A.'s room and started touching her vagina underneath her clothes. He then pulled his shorts and H.A.'s shorts off, got on top of her, "put" his penis into her vagina, and started "humping" her. H.A. stated that it hurt for a while and then it stopped. The next day, no one talked about what happened. No one heard what was going on, and no one asked what was going on.

Asked to describe another time, H.A. recounted when Mr. Thibeaux had told her to go sleep in the front room. After he came into the room, Mr. Thibeaux touched her underneath her clothes, took off her shorts, and started "licking" her. He then penetrated her vagina with his penis and "began humping."

Because it was hurting, Mr. Thibeaux put vaseline on H.A.'s vagina and then penetrated her vaginally again with his penis.

The interviewer asked H.A about a time when H.A. saw Mr. Thibeaux put on a condom. H.A. recalled when Mr. Thibeaux came into her room, started touching her, and pulled down her shorts. He put a condom on his penis, got on top of her, and "put" his penis in her vagina. Then Mr. Thibeaux started "humping" her and putting her in different positions. She explained that Mr. Thibeaux would pick her legs up and start "humping" her in such a position.

On the Monday prior to the interview, H.A. recounted how Mr. Thibeaux came into her room, began touching her, and then penetrated her vagina with his penis. After about ten minutes, Mr. Thibeaux ejaculated and then went back into his room. In each sexual encounter, H.A. recalled that Mr. Thibeaux would "wipe off" any seminal fluid from her vagina with a towel and even one time with her school shirt. According to H.A., her mother was always asleep when Mr. Thibeaux did these things to her, and it was always nighttime.

When the interviewer asked H.A. if Mr. Thibeaux ever talked to her about not telling anyone, H.A. stated that, before school one morning, he asked her if she was going to tell anyone. She told him she would not. The reason she did not want to tell anyone was because she was shy and scared. The interviewer asked H.A. if Mr. Thibeaux ever threatened her if she told someone. H.A. responded that Mr. Thibeaux told her that she would not be able to see her boyfriend if she ever told.

The interviewer then inquired as to whether there was any time when Mr. Thibeaux "put his private" somewhere else besides in her vagina. H.A. said in reply that he "put" his penis in her "butt." She described how she was in the front

room when Mr. Thibeaux came in and began touching her vagina. He then penetrated her vagina with his finger and started "humping" her in her anus, ejaculating in her anal canal. This, she clarified, was a completely different time than the other time something happened in the front room. She also said that it was painful when he penetrated her anally and that she tried to fight him, but Mr. Thibeaux held her legs. H.A. stated that he "put his private" in her anus another time, but she did not remember much about that time.

In further clarification, H.A. stated that Mr. Thibeaux's penis did not "go anywhere else" besides her vagina and anus, but she did have to touch his penis. One night while watching T.V., Mr. Thibeaux told H.A. to come over, and he pulled down his pants. He then grabbed her hand and made her touch and rub his penis. H.A. said this was a completely different time than any other time she talked about. When she pulled her hand away, Mr. Thibeaux left to go to another room.

After the video finished, the State called H.A.'s mother, Ashley Thibeaux, who testified that she initially believed her daughter. She even called Mr. Thibeaux and threatened him with violence for violating her child. When asked what Mr. Thibeaux said in response to her threat, Mrs. Thibeaux answered, "He told me that he didn't do anything and he told me that [H.A.] had came on to him." When questioned about the Burger King encounter and whether she had any concerns about bringing her daughter into a car with the man accused of molesting her, Mrs. Thibeaux replied that she had no such concerns after she saw her daughter embrace Mr. Thibeaux when he arrived at the restaurant. She further testified about how H.A. had recanted her story. Mrs. Thibeaux stated that H.A. told her that she was sleeping with her boyfriend and was afraid she was pregnant.

9

When questioned if H.A.'s counselor ever told her that H.A. was having sex with her boyfriend but not having sex with Mr. Thibeaux, Mrs. Thibeaux answered, "No." She just remembered the counselor telling her that she thought H.A. was having sex with her boyfriend. H.A.'s counselor, however, denied ever making this statement when she took the stand.

Mrs. Thibeaux admitted that she was with her husband in Opelousas in the weeks after H.A. reported the sexual assaults. And although she knew the police were looking for her husband, she explained that she did not call the police because H.A. told her nothing had happened between her and Mr. Thibeaux. Mrs. Thibeaux also testified that she and Mr. Thibeaux never had sex on H.A.'s bed. Though the family would share old sheets, the sheets from H.A.'s bed were new and only used on H.A.'s bed.

On cross-examination, Mrs. Thibeaux testified that she never heard H.A. yell for help and never saw any suspicious conduct between H.A. and Mr. Thibeaux. She also testified that she had caught H.A. lying to her about school and about her boyfriend.

Through the testimony of Jill Laroussini, a Registered Nurse and Sexual Assault Nurse Examiner (S.A.N.E.), the State introduced the report of H.A.'s sexual assault examination, performed on June 9, 2015, at OLOL. According to the report prepared by Ms. Laroussini, H.A. affirmed that her vagina was penetrated with a penis, finger, and tongue; that her anus was penetrated with a penis, finger, and tongue; and that there was penetration of H.A.'s mouth by a penis. Ms. Laroussini testified that her intent in the report was to refer to just the most recent sexual assault. H.A. also reported that she "go[t] on top of [Mr. Thibeaux]." According to the report, H.A. was getting "Depo[-Provera]"

injections, which contain the hormone progestin and can be used for birth control and hormonal abnormalities.

As for the section of the report addressing verbal threats, H.A. reported: "If I asked him to visit my boyfriend, he told me I have to do that if I want to go." The report further recorded that there were no threats of harm, choking, bites, hitting, burns, guns, knives, blunt objects, restraints, chemicals, or other weapons, but there was holding. Specifically, H.A. reported: "Holds my arms and my legs." Also contained in the report was H.A.'s narration of the sexual assault that allegedly occurred on June 8, 2015, about which Ms. Laroussini testified:

> "Yesterday nine or 10:00 they was watching TV in her room. He came out the room and he sat on my bed and he stuck - -
>
> . . . .
>
> "He sat on my bed and he started me [sic] and stuff between my legs. I don't remember what he said. He started touching on my breasts. He put his mouth there. Took off my shorts and started [sic] lick on me. He took off his shorts. He put his private in me. Started humping me and stuff. I was fighting him and he pulled my arms away from him. After a while he stopped then he got off me and told me pull my shorts back on. Then he went back in my mama's room. I continued playing on my mama's phone and then I started crying. He put the liquid stuff on me." And then I signed as though it was done and then later in the exam she reported, "Back in time he was doing it while I was on the phone with my boyfriend. He wanted to know why I was crying."

While Ms. Laroussini's physical examination of H.A. showed no tears, bruises, or other injuries, she noted that H.A. did have "quite a large amount of yellow-white liquid substance dripping from the vaginal vault." She explained that the yellow-white substance may have been a result of the body's creation of

11

more mucus to wash out something that did not belong in the vagina. When asked if there was any evidence that H.A. had had sex recently, Ms. Laroussini replied:

> On physical exam and direct visualization, I did not find injury. I can't say. I don't have the expertise to say whether a patient has had sex recently. But I can tell you that her report was consistent with my findings. And we do not see injury in about 85 to 90 percent of rape cases.

On cross-examination, Ms. Laroussini stated that, when she examined H.A.'s anus, everything looked in the normal limits, and she did not chart the presence of hemorrhoids.

Carolyn Booker, a DNA analyst who was accepted as an expert, testified about her analysis of the stains from H.A.'s fitted bed sheet and panties. According to her, a mixed DNA profile consisting of at least four contributors was obtained from the epithelial fraction of the seminal fluid stain on the sheet from which neither H.A. nor Mr. Thibeaux could be excluded as contributors. Ms. Booker explained that 99.996 percent of people in the world are expected to be excluded from this mixture, as H.A.'s boyfriend was. She further opined: "In the absence of identical twins, it can be concluded to a reasonable degree of scientific certainty that Nathaniel Thibeaux is the source of the DNA from the sperm fraction in the seminal fluid stain on the sheet."

As for the sperm fraction of the seminal fluid on H.A.'s panties, Ms. Booker testified that three contributors were found. H.A. could not be excluded as a contributor to the epithelial fraction of seminal fluid found on her panties, but both Mr. Thibeaux and H.A.'s boyfriend were excluded as contributors. H.A. could also not be excluded from the sperm fraction on the panties, but both Mr. Thibeaux and H.A.'s boyfriend were excluded. Nevertheless, a mixed partial Y-STR profile was also obtained from the sperm fraction of the seminal fluid stain on

the panties from which Mr. Thibeaux could not be excluded as a contributor, though H.A.'s boyfriend was again excluded.

Explaining how Mr. Thibeaux could be excluded in the DNA profile but not excluded in the Y-STR profile, Ms. Booker testified: "The Y chromosome testing is a little bit more sensitive than the autosomal testing. And I got a better profile from the Y testing, so I can draw a conclusion that he could not be excluded as a Y donor." Moreover, because he could not be excluded on the Y-STR, she testified that it was possible that some of the samples she tested in the DNA profile were from Mr. Thibeaux. If she had a better sample, she would have been able to be more accurate.

Ms. Booker testified on cross-examination that presumptive testing was positive for blood on the rectal swabs but not in the fingernail swabs collected during H.A.'s sexual assault examination. The vaginal swabs that were taken in the sexual assault kit showed no seminal fluid. Additionally, no spermatozoa were found on the vaginal, oral, or rectal slides. Ms. Booker also explained that seminal fluid comes from males only but that female epithelial cells can be mixed in the sample. She clarified on re-direct that, although there were three male contributors to the epithelial fraction of seminal fluid on the sheet, there was only one contributor to the sperm fraction—Mr. Thibeaux.

The sole witness to testify for the defense was Mr. Thibeaux. He testified that he had been in prison four times—twice for distribution of cocaine and twice for possession of cocaine. Further, he denied raping, molesting, fondling, or any other activity with H.A. and also denied having oral, vaginal, or anal sex with H.A. When asked on cross-examination to explain why he would

have told his wife that the reason he did what he did to H.A. was because H.A. came on to him, Mr. Thibeaux explained:

> Well, I did say that. But the reason why I said that, a lot of people caught what I said in the wrong way. She came onto me as a father figure. [H.A.] and the rest of her kids really never had a father in their life.

Again when asked if he raped and molested his stepchild at least thirty times, Mr. Thibeaux replied, "I haven't touched her, sir."

In its closing statement, the State broke down the conduct that supported each of the offenses charged:

- Count One (Aggravated Rape)—the first time Mr. Thibeaux anally raped H.A.

- Count Two (Aggravated Rape)—the first time Mr. Thibeaux vaginally raped H.A.

- Count Three (Aggravated Rape)—the vaginal rape that occurred when H.A.'s mother left to pick up H.A.'s brother and H.A. had just showered.

- Count Four (Aggravated Crime Against Nature—sexual intercourse)—the vaginal intercourse where Mr. Thibeaux used vaseline.

- Count Five (Aggravated Crime Against Nature—Sexual Intercourse)—the other time Mr. Thibeaux had anal intercourse with H.A. as described in her Hearts of Hope interview.

- Count Six (Aggravated Crime Against Nature—Sexual Intercourse)—the last time Mr. Thibeaux had vaginal intercourse with H.A. on June 8, 2015.

- Count Seven (Aggravated Crime Against Nature—lewd fondling)—the first time Mr. Thibeaux molested H.A. in the apartment.

- Count Eight (Aggravated Crime Against Nature—lewd fondling)—the time Mr. Thibeaux licked H.A.'s vagina and her mother walked in.

- Count Nine (Aggravated Crime Against Nature— lewd fondling)—the incident where Mr. Thibeaux made H.A. grab his penis.

The jury returned unanimous guilty verdicts on counts one, two, four, five, seven, and eight. The verdict on count three was ten to two in favor of guilty, and the verdicts on counts six and nine were eleven to one also in favor of guilty.

## III.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there is one error patent. The trial court did not specify whether Mr. Thibeaux's sentences for aggravated crime against nature are to be served with or without hard labor. Therefore, we vacate the sentences and remand for resentencing with instructions to specify whether the sentences are to be served with or without hard labor.

## IV.

## LAW AND DISCUSSION

When a defendant raises issues on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court must first resolve the sufficiency issue. *State v. Hearold*, 603 So.2d 731 (La.1992). This is because, if the entirety of the evidence is insufficient to support the conviction, "the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot." *Id*. at 734. Accordingly, we will first address Mr. Thibeaux's sufficiency arguments.

15

*Sufficiency of Evidence*

In his second assignment of error, Mr. Thibeaux asserts that the evidence was insufficient to prove that three separate acts of sexual intercourse occurred and that H.A. resisted each sexual act to the utmost but her resistance was overcome by force. Rather, he contends that the evidence presented to prove counts one through three was sufficient to convict him of sexual battery; thus, the aggravated rape convictions should be reversed, verdicts of sexual battery should be entered, and the case should be remanded for resentencing on the lesser verdicts.

*Standard of Review*

This court in *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, set forth the analysis for insufficiency of the evidence claims:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*Elements of Aggravated Rape*

The State charged Mr. Thibeaux with three counts of aggravated rape upon his stepdaughter, violations of La.R.S. 14:42(A)(1). H.A. was thirteen when the rapes began and had turned fourteen by the time they ended. At the time of the offenses, La.R.S. 14:42(A)(1) provided, in pertinent part:[2]

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.

To prove Mr. Thibeaux committed the aggravated rapes as charged in the indictment, the State was required to establish that the victim, in each separate instance, resisted the act to the utmost, but her resistance was overcome by force. In brief to this court, Mr. Thibeaux notes that H.A. admitted that she did not scream during the alleged acts, did not try to push Mr. Thibeaux off, and did not kick Mr. Thibeaux. Moreover, H.A. offered very little details suggesting any force was used upon her. As to the first encounter, when asked what she did, H.A. testified that "I would move my legs and he would try to move them down" without explanation. Again in her forensic interview, H.A. discussed that Mr. Thibeaux would move her legs. However, Mr. Thibeaux posits that the movements were more for placement of position rather than to subdue or restrain.

---

[2]After the commission of the instant offenses, the crimes of aggravated rape and forcible rape were renamed first degree rape and second degree rape, respectively, in 2015 La. Acts No. 184, § 1. The elements, however, were unchanged. Therefore, for consistency with the transcript and record, we will refer to the crimes as aggravated rape and forcible rape.

According to Mr. Thibeaux, the only time H.A. discussed any type of resistance was during the first anal rape. When asked if she tried to stop him, H.A. said she did, but he kept holding her down. But again, Mr. Thibeaux notes that she did not elaborate as to what she meant by this comment or what she did to try to stop him. H.A. testified that although she was on the phone with her boyfriend, she did not tell her boyfriend what was occurring and she did not ask for help. The only threat H.A. testified to was that Mr. Thibeaux told her she would not be allowed to see her boyfriend if she told anyone. But these responses and non-existent, or at most minimal, resistance, Mr. Thibeaux argues, do not indicate H.A. resisted to the utmost but was overcome by force.

The State, however, contends that the jury decided the elements of aggravated rape were met after hearing H.A.'s testimony at trial and her Hearts of Hope interview. As to count one, the State notes that H.A. stated that the first time Mr. Thibeaux raped her anally she tried to fight him off, but he held her down and did it anyway. She told the jury that, not only did she tell him to stop, she physically tried to stop him, but he kept holding her down. Regarding count two, H.A. testified that Mr. Thibeaux tried to whip her and that she made noises in hopes that it would make him nervous. She also testified that she would resist by moving her legs around, but he would hold them down.

Concerning count three, H.A. was asked whether there was any other time where Mr. Thibeaux had sex with her and she resisted him. H.A. then proceeded to tell the story about the time she was home alone with Mr. Thibeaux when he came into her room after she had taken a shower and made her have sex with him. The State points to this line of questioning and her response immediately followed her relaying of the events involved in count one wherein she

18

described trying to stop Mr. Thibeaux from anally raping her, but he kept holding her down. By the State's immediately asking H.A. if there was any other time she resisted Mr. Thibeaux, it was rational, the State argues, for a jury to conclude that her resistance in the events of count three was similar to the resistance she had just described in count one. The State further contends that the jury was able to see both H.A.'s and Mr. Thibeaux's size when they walked to the witness stand to testify and, thus, was able to compare their sizes.

In determining whether the evidence of the victim's resistance and the force used to overcome it were sufficient for any rational factfinder to find that the requirements for aggravated rape were proven beyond a reasonable doubt, we look to the jurisprudence for both comparison and guidance as to proportionality.

This court, in *State v. Pitts*, 11-1020, p. 7 (La.App. 3 Cir. 4/4/12), 87 So.3d 306, 313, *writ denied*, 12-980 (La. 10/26/12), 99 So.3d 639, addressed the proof necessary for aggravated rape as compared to forcible rape:

> The degree of force necessary to prove forcible rape was addressed by the court in *State v. Berniard*, 03-484, p. 10 (La.App. 5 Cir. 10/15/03), 860 So.2d 66, 73, *writ denied*, 03-3210 (La.3/26/04), 871 So.2d 345:
>
>> The difference between aggravated rape and forcible rape is the "degree of force employed and the extent to which the victim resists." *State v. Parish*, 405 So.2d 1080, 1087 (La.1981); *State v. Puckett*, 02-997, p. 10 (La.App. 5th Cir.1/28/03), 839 So.2d 226, 231. A greater degree of force is necessary to justify the more serious punishment imposed for aggravated rape. *State v. Jackson*, 437 So.2d 855, 858 (La.1983). The degree of force employed and the determination of the grade of rape is for the jury to decide. *State v. Cepriano*, 00-213, p. 9 (La.App. 5th Cir.8/29/00), 767 So.2d 893, 899. Nonetheless, the mere fact the defendant was unarmed and the victim

19

> suffered no extensive physical pain or injury
> does not negate the possibility that an
> aggravated rape occurred. *Puckett*, 02-997
> at p. 8, 839 So.2d at 231.

While a greater degree of force is necessary to justify the more serious punishment imposed for aggravated rape, "there is no magic formula to determine which acts of coerced sexual intercourse warrant the greater punishment of aggravated rape rather than forcible rape. Each case must be examined on its own facts." *State v. Jackson*, 437 So.2d 855, 858 (La.1983). Thus, the jury is assigned "the function of fixing the range of permissible punishment for convicted offenders by returning a verdict which appropriately fits the crime and the degree of force employed." *State v. Willie*, 422 So.2d 1128, 1129 (La.1982).

Viewing all the evidence in a light most favorable to the state, this court, in *State v. Helaire*, 496 So.2d 1322, 1323 (La.App. 3 Cir. 1986), *writ denied*, 503 So.2d 13 (La.1987), found the evidence was sufficient to uphold the defendant's conviction for the aggravated rape of his fourteen-year-old "common-law" stepdaughter. According to her trial testimony, the victim attempted to get away when the defendant began making sexual advances toward her, but eventually the defendant "grabbed her arm and pulled her into the bedroom" where he "lifted up her robe, pulled down her panties, got on top of her, and forced her to have sexual intercourse with him." *Id.* at 1323. When she tried to get out from under him, the defendant held her down and was "too heavy." *Id.* at 1325. The victim testified that she asked him to stop, but he would not. She further detailed how she cried and screamed during the rape and how the defendant threatened that he was going to do something to her and her mother that the victim would not like. The victim's younger brother further testified that he heard her crying and "peeped

20

through the keyhole to see what was going on." *Id.* at 1323. Once he entered the room, the defendant stopped his attack. On appeal, this court found that "[s]ince the victim was only fourteen at the time of the offense and the defendant was much heavier and stronger, the jury could find that the victim resisted to her utmost." *Id.* at 1326.

In *State v. Puckett*, 02-997 (La.App. 5 Cir. 1/28/03), 839 So.2d 226, *writ denied*, 03-891 (La. 12/12/03), 860 So.2d 1148, the fifth circuit likewise affirmed the defendant's conviction of aggravated rape based on the sufficiency of the evidence. The evidence established that the defendant therein rang the victim's doorbell and then "forced his way into the victim's home when she opened the door. He grabbed her, ripped her nightgown, and threw her down on the sofa bed all while pulling her hair and punching her." *Id.* at 230. Grabbing her off the sofa, he then pushed her to the floor "where he poured syrup all over her hair and body." *Id.* at 230. The defendant tightly held the victim's head, forcing her to perform oral sex, and then had vaginal intercourse with her. The victim testified that she tried to fight him off "as hard as she could and that she never gave up her fight." *Id.* at 230. As a result of the assault, the victim had a torn toenail, an abrasion on her foot, and her head and calf were sore to the touch. In affirming, the court reasoned:

> The jury had before it the responsive verdict of forcible rape but determined the amount of force employed and resistance exerted amounted to aggravated rape. Additionally, the jury heard testimony from both the victim and the defendant. The jury either concluded that the evidence proved that the victim resisted to her utmost and was overcome by force or was prevented from resisting by defendant's acts of physical abuse immediately before the rape which were tantamount to threats of great bodily harm accompanied by apparent power of execution. We find that the evidence supports

21

the jury's determination that the amount of force employed constituted aggravated, rather than forcible, rape.

*Id.* at 231-32.

Relying on *Puckett*, this court, in *State v. Davis*, 09-1061 (La.App. 3 Cir. 4/7/10), 36 So.3d 351, *writ denied*, 11-1908 (La. 4/27/12), 86 So.3d 623, also found the amount of force was sufficient to satisfy the element of aggravated rape. The victim therein testified that she "was sleeping with her six-month-old son when she awoke to see the defendant rushing toward her." *Id.* at 353. Grabbing her by the hair, the defendant threw the victim out of bed onto "the floor and then back on the bed" again. *Id.* at 353. He told her to take off her underwear. "When she did not act fast enough, he threw her on the floor again at which time she complied." *Id.* at 354. "He pushed her over the bed and attempted to penetrate her from behind, but she kept squirming around." *Id.* at 354. Unsuccessful, he then dragged her from the bedroom to the living room, "pushed her down into the couch," and again attempted several times to penetrate her vaginally from behind, but was unable to because "she kept trying to move away[.]" *Id.* at 354-44. The defendant then dragged her back into the bedroom. Pushing her to her knees, the defendant "tried to force her to perform oral sex on him, but she refused." *Id.* at 355. Finally, with a pillow over her face and "a plastic Wal-mart bag" wrapped around his penis, he penetrated her vaginally. *Id.* at 355. The victim testified that she was terrified that the defendant was going to kill her and her baby. In affirming the jury's verdict, this court reasoned: "The jury heard the testimonies and had the option to impose the responsive verdict of forcible rape, but must have determined that the victim resisted to the utmost and that the physical abuse

inflicted was tantamount to threats of great bodily harm accompanied by apparent power of execution." *Id.* at 357.

However, more recently, in *State v. Carter*, 14-926 (La.App. 3 Cir. 4/1/15), 160 So.3d 647, *writ denied*, 15-859 (La. 6/17/16), 192 So.3d 770, this court concluded that the evidence was insufficient to find that the victim resisted the defendant's sexual acts to the utmost but her resistance was overcome by force. Therein, the jury convicted the defendant of the lesser included responsive offense of attempted aggravated rape, which still required the state to prove the victim resisted to the utmost but was overcome by force. Although the victim testified to several sexual encounters with the defendant beginning when she was "six . . . years old and continuing until she was in her teens[,]" this court found that there were only three incidents upon which the jury could have based its verdict. *Id.* at 649. In the first two incidents, the defendant "offered to give [the victim] driving lessons." *Id.* at 649. On the first occasion, "he pulled to the side of the road, alleging he needed to adjust the seat, pulled his penis out of his pants, and then had [the victim] sit on his lap to drive." *Id.* at 649-50. The victim testified that there was no penetration "because she was wearing her panties and skirt." *Id.* at 650. During the second encounter, the defendant again "pulled over and adjusted the seat," but the victim, realizing what was happening, "refused to sit on [his] lap." *Id.* at 650.

In the third incident, the victim testified that she was "watching television when [the d]efendant came to her house . . . . and asked for a watermelon from [her] father's [produce] truck." *Id.* at 656. The defendant came to the truck shortly after she did, and while she was in the bed of the truck, he made [her] lay down, and . . . had sex with [her]." *Id.* at 656 (alterations in

23

original). She further testified that he picked up her dress, pushed her panties over to the side, and got on top of her. Although she was able to "just jump[] up" after the defendant penetrated her vaginally, the victim testified that she was scared, hysterical, and "didn't know [what] was going to happen." *Id.* at 656 (alterations in original). This court noted, however, that the victim "did not testify that she resisted to the utmost" or that the defendant "overcame her resistance with force" in any of the encounters; nor was there any testimony that the victim resisted from the witness to the assaults, who conceded that the victim did not scream during the rape. *Id.* at 652. Therefore, this court concluded:

> The State did not offer any other evidence in support of each of the elements of the crime of aggravated rape or attempted aggravated rape, the offense of which Defendant was eventually convicted. B.P. was not under twelve during the relevant time frame, testified that Defendant did not threaten her, and the State did not prove that B.P. "resist[ed] the act to the utmost, but [that her] resistance [was] overcome by force." Even when viewed in a light most favorable to the prosecution, the State failed to prove Defendant committed the offense of attempted aggravated rape beyond a reasonable doubt.

*Id.* at 652-53 (alterations in original).

Considering the evidence introduced at trial herein as to the present victim's resistance and the force used to overcome it in relation to the resistance and force recited in the cases above, we find the evidence was insufficient for any rational factfinder to find that the element of aggravated rape at issue—H.A. resisted to the utmost but her resistance was overcome with force—had been proven beyond a reasonable doubt. In each of the cases in which the courts found that the element of utmost resistance overcome by force was satisfied, the State presented evidence that the victim resisted by crying, screaming, trying to run

24

away, or squirming, or that her attempts to do so were met with threats or physical violence in the form of the defendant throwing, grabbing, dragging, punching, or striking the victim.

The evidence herein shows that as to count one, the first anal rape, H.A. said that she resisted, but Mr. Thibeaux held her down. As to count two, the first vaginal rape, H.A. testified that Mr. Thibeaux would try to whip her and that she would make noises. She also said that she resisted by moving her legs, but Mr. Thibeaux would hold them down. Regarding the third count, we find the only specific evidence of resistance was the fact that H.A. described the rape in response to the State's question, "Was there any other time where he had sex with you and you resisted him?" H.A. testified, however, that she did not scream, yell, or kick Mr. Thibeaux during any of the assaults. There was no testimony that H.A. tried to get away and was prevented by either threats of harm or force from Mr. Thibeaux. The only threat spoken of was her ability to see her boyfriend. And though the movement of her legs was met by Mr. Thibeaux holding her down or trying to "whip" her, this force is not to the degree of or in proportion to the force exerted in the jurisprudence discussed above. Thus, although there was evidence of resistance as to each count, we do not find that any rational factfinder could have found that this evidence, even when viewed in a light most favorable to the prosecution, proves beyond a reasonable doubt that H.A. resisted the acts to the utmost but that her resistance was overcome by force so to warrant the greater degree of punishment imposed for aggravated rape.

Because we find the State did not prove beyond a reasonable doubt that Mr. Thibeaux committed the offense of aggravated rape, we will now consider whether a lesser included responsive offense was proven.

25

*Responsive Verdicts*

Pursuant to La.Code Crim.P. art. 821(E), an appellate court, instead of granting a judgment of acquittal, may modify the verdict and render a judgment of conviction on a lesser included responsive offense, "[i]f the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense." When the evidence does support a conviction on a lesser included offense, "the discharge of the defendant is neither necessary [n]or proper." *State v. Byrd*, 385 So.2d 248, 251 (La.1980). The following are the only responsive verdicts that may be rendered when an indictment charges the offense of aggravated rape:

> Guilty.
>
> Guilty of attempted aggravated or first degree rape.
>
> Guilty of forcible or second degree rape.
>
> Guilty of attempted forcible or second degree rape.
>
> Guilty of sexual battery.
>
> Guilty of simple or third degree rape.
>
> Guilty of attempted simple or third degree rape.
>
> Guilty of oral sexual battery.

La.Code Crim.P. art. 814(A)(8). Therefore, we must now address whether the evidence was sufficient to prove the responsive verdicts of forcible rape or the even lesser included responsive offense of sexual battery, as Mr. Thibeaux concedes.

26

*Elements of Forcible Rape*

Louisiana Revised Statutes 14:42.1 defines forcible rape, in pertinent part, as follows:

> A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> > (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

Recently, this court clarified the proof necessary to sustain a conviction for forcible rape:

> To sustain a conviction for forcible rape, actual resistance is not required. Rather, all that is necessary is that the victim be *prevented from* resisting by force or threats of physical harm to such an extent that she *reasonably believed* resistance to be futile. Only a subjective, reasonable belief is necessary.

*Carter*, 160 So.3d at 654 (citations omitted).

In *State v. Powell*, 438 So.2d 1306 (La.App. 3 Cir.), *writ denied*, 443 So.2d 585 (La.1983), the minor victim approached the defendant's car and asked him for a ride. Although he agreed to take her to a cousin's house, he brought her to a secluded area instead. The victim testified that the defendant slapped her, threatened to kill her, and indicated a weapon was under the seat of the vehicle. After she removed her own pants, he had sexual intercourse with her. A panel of this court concluded that there was no evidence of resistance and little evidence that she believed resistance to be futile. However, Judge Stoker, in a strongly worded dissent, opined:

27

The victim in this case stated that she submitted because the defendant threatened to kill her if she did not. Although she did not state in so many words that she did not resist because she believed that resistance would not prevent the rape, that is the clear meaning of her testimony. If that meaning is not given to her testimony, it is tantamount to requiring a person threatened with rape to either be faced with a dangerous weapon or to resist to the utmost and, in either case, subject themselves to the possibility of great physical harm or death. This is resistance in the context of aggravated rape. Forcible rape requires less.

*Id.* at 1310.

This court then endorsed the *Powell* dissent in *State v. Schexnaider*, 03-144 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, and upheld a conviction for forcible rape when the defendant neither threatened the victim nor had a weapon. In *Schexnaider*, the minor victim testified that she and the defendant were sitting on the tailgate of the defendant's truck when he "grabbed her face, kissed her and pushed her onto her back in the bed of his pick-up truck." *Id.* at 454. The defendant then "proceeded to get on top of her," took off her shoes and pants, and penetrated her vaginally. *Id.* at 454. Although the defendant did not slap her and she did not resist, the victim did testify that "when she get[s] frightened, she freezes." *Id.* at 454. Eventually, "she was finally able to tell the [d]efendant 'No,'" and when she threatened to tell her friend, the defendant stopped. *Id.* at 454. The victim also testified that there was really nothing she could do to get the defendant off of her because "he was bigger than her, and she was pinned under the Defendant's weight." *Id.* at. 457. This court found "that the evidence and testimony introduced at trial establishes that Defendant used sufficient force against the victim to sustain the Defendant's conviction." *Id.* at 459.

28

More recently, this court in *Carter*, 160 So.3d 647, found that, while the evidence recited previously did not support a conviction for attempted aggravated rape, it did support the lesser included offense of forcible rape. In so holding, the *Carter* court relied on *Schexnaider* and the fifth circuit's decision in *State v. Wilkinson*, 00-339, p. 15 (La.App. 5 Cir. 10/18/00), 772 So.2d 758, 766, *writ denied*, 00-3161 (La. 10/12/01), 799 So.2d 494, wherein the court found that the evidence was sufficient to convict the defendant of forcible rape when the defendant, without threatening the victim and without a weapon:

> forcibly grabbed [the victim], threw her to the ground, pushed down her clothing, laid on top of her and penetrated her vaginally several times. [The victim], a fourteen-year-old, was frightened, weighed down by the backpack and did not know whether any action on her part would have caused him to do additional harm. She was thrown into a secluded area and could have reasonably believed that screaming would be futile.

Comparing the facts before it with both *Wilkinson* and *Schexnaider*, the *Carter* court found:

> The parallels between *Wilkinson*, *Schexnaider*, and the instant matter are striking and support a finding of forcible rape. In *Schexnaider*, 852 So.2d at 454, 457, the defendant "pushed her onto her back in the bed of his pick-up truck" and "got on top of her." In *Wilkinson*, 772 So.2d at 766, the defendant "pushed down [the victim's] clothing [and] laid on top of her" after he grabbed her and threw her to the ground. In the instant matter, although the victim testified that Defendant "said, lay down," she also testified "[she] didn't know [intercourse] was going to happen[]" and that Defendant "made" her lie down in the bed of the truck. Then, he pushed her panties to the side; she did not willingly remove them. Then, he "got on top of [her]" and had sex with her. Additionally, B.P. indicated she was scared, confused, and upset. She "jumped up" when it began to hurt. In slightly different words, the victims in *Schexnaider*, *Wilkinson*, and the instant matter said the same thing; an adult man made them get on their back, got on top of them, and penetrated them vaginally. Although B.P. did

not explicitly say that she did not resist because she believed that resistance would be futile, it is clear from B.P.'s testimony that when Defendant "made [her] lay down," "pushed" her panties to the side, and "got on top of [her,]" she believed it pointless to resist. Consideration of the victim's age and size supports this conclusion. B.P. was a young girl of barely twelve years old; Defendant was an adult man. Although B.P. did not directly testify to the size difference between the two, she explained that, at one point, Defendant was large enough to physically pick her up and carry her to his bathroom, where he got on top of her and had sex with her. The conclusion that B.P. thought it futile to resist is further buttressed by the history of Defendant having taken advantage of her on numerous prior occasions and her having been helpless to dissuade him on any of the prior occasions. . . . A jury could reasonably have concluded that the victim reasonably believed that, against the force Defendant exerted with his body as he "got on top" of B.P., resistance was useless, especially in light of her age, her size, and the extensive history between the two.

*Id.* at 656-57 (all but final alteration in original).

As recited and noted above, the evidence presented by the State through H.A.'s testimony, her Hearts of Hope interview, and the report of her sexual assault examination does support a finding that she resisted in each of the sexual assaults for which Mr. Thibeaux was convicted of aggravated rape. In both counts one and two, H.A. testified that she did resist but her resistance was thwarted by Mr. Thibeaux holding her down or attempting to "whip" her. Moreover, the jury was able to compare the sizes of both H.A. and Mr. Thibeaux and take the difference in their sizes into consideration. Also of relevancy was the fact that H.A. was only thirteen and fourteen at the time of the rapes and Mr. Thibeaux was an adult man. Additionally, Mr. Thibeaux was in a position of authority over H.A., which may have affected her belief that further resistance would be useless.

Taken with the history of abuse H.A. testified to at trial and in her interview and her fear that "he could do something else like abuse[,]" which prompted her to not "do anything[,]" the jury could have concluded that H.A. reasonably believed that further resistance was useless. Therefore, we find the evidence was sufficient to prove forcible rape as to counts one and two. But as to the third count, while H.A. did recount the vaginal rape that occurred when she was home alone with Mr. Thibeaux in response to the State's question about whether there was any other time she resisted, the State did not present any evidence or details regarding either (1) the force employed by Mr. Thibeaux, or (2) H.A.'s belief that resistance would be futile in that instance. An inference that the same amount of force was exerted as in count one just because H.A. testified to count three directly following her testimony as to count one is simply not sufficient to prove the elements of forcible rape.

However, as Mr. Thibeaux concedes, the evidence was sufficient to prove sexual battery pursuant to La.R.S. 14:43.1(A), which provides, in pertinent part:

> Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:
>
> (1) The offender acts without the consent of the victim.
>
> (2) The victim has not yet attained fifteen years of age and is at least three years younger than the offender.

31

All the elements necessary to prove the offense of sexual battery were clearly met in this case as to count three given that H.A. testified that Mr. Thibeaux penetrated her vagina with his penis without her consent when she was under the age of fifteen and more than three years younger than Mr. Thibeaux.[3] Accordingly, we modify the verdict and render a judgment of conviction on the lesser included offense of forcible rape for counts one and two and on the lesser included offense of sexual battery for count three. We further remand for resentencing in accordance with that judgment.

### Ineffective Assistance of Counsel

Mr. Thibeaux asserts that he received ineffective assistance of counsel in several respects: failure to challenge jurors for cause, defense counsel's absence during the playing of H.A.'s Hearts of Hope interview, failure to make sure bench conferences were recorded, and failure to object to the trial court's instruction on impeachment evidence.

### Legal Standard for Ineffective Assistance of Counsel

The United States Supreme Court has set forth the legal standard for such constitutional challenges, explaining:

> A criminal defendant is guaranteed the effective assistance of counsel. United States Sixth Amendment; La. Const. art. I, § 13; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Washington*, 491 So.2d 1337 (La.1986). To establish a claim of ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in

---

[3] The Louisiana Uniform Abuse Prevention Order, dated June 30, 2015, recites Mr. Thibeaux's date of birth as "8/8/78" and his height and weight as "5'10'"" and "180", respectively.

prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. *Strickland v. Washington*, *supra*; *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." *State v. Ratcliff*, 416 So.2d 528, 531 (La.1982).

A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. *E.g.*, *State v. Prudholm*, 446 So.2d 729 (La.1984). However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate. *E.g.*, *State v. Hamilton*, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35.

*State v. Bright*, 98-398, pp. 40-41 (La. 4/11/00), 776 So.2d 1134, 1157, *reversed on other grounds*, 02-2793, 03-2796 (La. 5/25/04), 875 So.2d 37.

*Failure to Challenge Jurors For Cause*

Mr. Thibeaux first contends his trial counsel was ineffective for failing to challenge three jurors for cause and failing to peremptorily strike these same jurors from serving on the jury. One of the jurors, M.B., had a niece who was molested by her stepfather. Another juror, T.A., told the court that she and her two sisters were sexually molested for ten years by her father. The third juror, S.B., was molested by her grandfather for two years. Mr. Thibeaux argues that there was no conceivable trial strategy for leaving M.B., T.A., and S.B. on the jury in the present case. He further contends that there is no way to know the impact these jurors may have had on the final votes of the other jurors, namely on counts three, six, and nine, which were not unanimous verdicts. Therefore, Mr. Thibeaux concludes that he was prejudiced by his counsel's inaction.

In response, the State argues that defense counsel's decisions to accept the jurors were trial strategy decisions that should be relegated to post-conviction relief. We agree.

As this court stated in *State v. Mitchell*, 13-426, pp. 28-29 (La.App. 3 Cir. 11/6/13), 125 So.3d 586, 605, *writ denied*, 14-102 (La. 6/20/14), 141 So.3d 807:

> Decisions relating to investigation, preparation, and strategy require an evidentiary hearing and cannot possibly be reviewed on appeal. Only in an evidentiary hearing in the district court, where the defendant could present evidence beyond that contained in the instant record, could these allegations be sufficiently investigated. Accordingly, the defendant's claims of ineffective assistance of counsel will be relegated to post-conviction relief.

Because we find defense counsel may have exercised trial strategy in his decision as to these jurors, we relegate this matter to post-conviction relief, where an evidentiary hearing may be held to investigate defense counsel's reasons, if any, for not challenging these jurors.

*Defense Counsel's Absence During Playing of Hearts of Hope Video*

Mr. Thibeaux next asserts that his trial counsel was ineffective for absenting himself during the playing of H.A.'s Hearts of Hope interview to the jury. As the record reflects, trial counsel informed the court and the jury that he would be stepping out for a few minutes during the playing of the video to which the court responded:

> Sure, absolutely. [Defense counsel] has a conference that he has to take on an issue that is kind of an emergency issue in federal court. So he will step into the back and take care of that issue. I think you've - - everybody understands you have reviewed the video as well.

Trial counsel assured the court that he had reviewed the video.

In brief, Mr. Thibeaux argues that during his counsel's absence, he sat alone at the defense table, in full view of the jury, while the jury listened to the repeated allegations made by H.A. Although there was no examination of a witness during this time frame, critical evidence was received and deciphered by the jury. Further, Mr. Thibeaux asserts that the perception portrayed by the absence of counsel was surely one of abandonment of his client. He also claims that the video was played twice and that the record raises serious questions of whether defense counsel's presence in the courtroom could have prohibited the need for any potential playing of the video for a second time, which could not have been favorable to Mr. Thibeaux.

The State, however, in its brief, explains that defense counsel returned to the courtroom within twenty minutes, well before the video ended, and that the tape was not played twice. Any reference to stopping the video merely involved fast forwarding over a section that the parties had previously agreed to exclude because it contained evidence of prior bad acts on the part of Mr. Thibeaux. Thereafter, the State began the tape again. Moreover, the State asserts defense counsel had already reviewed the video and knew that there was no content played to which he needed to object. Therefore, according to the State, this claim should be denied as just not factually valid.

Although there is some lack of clarity as to when the tape was stopped and started again, we find the record does not indicate the video was played twice. Considering the fact that defense counsel reviewed the tape, informed the jurors as to why he would be absent, and returned to court before any other evidence was

introduced, we find that Mr. Thibeaux fails to show that he suffered any prejudice so to prove this ineffective assistance of counsel claim.

*Failure to Make Sure Bench Conferences Were Recorded*

In his third assertion, Mr. Thibeaux claims that his trial counsel was ineffective for failing to make sure bench conferences were recorded. According to him, numerous bench conferences were held during the course of the trial, but none was recorded. Further, although many of the bench conferences discussed procedural matters, some were obviously for the purpose of arguing objections. Failure of these bench conferences to be recorded, Mr. Thibeaux argues, has limited his appellate review and resulted in circumstances where others have to second-guess what may have transpired, particularly in those hearings where it was acknowledged that pertinent objections were raised and legal arguments made. Though alone this might not rise to a showing of prejudice, Mr. Thibeaux argues that this, coupled with the other actions and inactions of his trial counsel, suggests "an appearance of impropriety" concerning counsel's representation.

In *State v. Pinion*, 06-2346, pp. 7-8 (La. 10/26/07), 968 So.2d 131, 134-35, our supreme court stated the following regarding unrecorded bench conferences:

> This Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr.P. art. 843, which requires in felony cases the recording not only of the evidentiary portions of trial but also of "the examination of prospective jurors . . . and objections, questions, statements, and arguments of counsel." *State v. Hoffman*, 98-3118, p. 50 (La. 4/11/00), 768 So.2d 542, 586. The Court has instead conducted a case-specific inquiry to determine whether the failure to record the conferences results in actual prejudice to the defendant's appeal. As a general rule, the failure of the record to

> reflect the argument of counsel on objections, even when made in open court, does not affect a defendant's appeal because it does not hinder adequate review of the trial court's ruling. *State v. Johnson*, 438 So.2d 1091, 1104 (La.1983). Thus, the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant.

Considering the vague arguments made by Mr. Thibeaux with respect to any prejudice that he suffered as a result of the unrecorded bench conferences in the present case and the lack of any indication that these bench conferences had a discernible impact on his trial, we find Mr. Thibeaux has failed to prove prejudice and, in turn, a claim of ineffective assistance of counsel.

*Failure to Object to Instruction on Impeachment Evidence*

Mr. Thibeaux last asserts that his trial counsel was ineffective for failing to object to the untimely and poorly-worded instruction regarding impeachment evidence given by H.A.'s counselor, Ms. Smith. The testimony at issue occurred when Mrs. Thibeaux was asked if H.A.'s counselor ever told her that H.A. said she was having sex with her boyfriend but was not having sex with Mr. Thibeaux. Mrs. Thibeaux answered, "No." She just remembered the counselor telling her that she thought H.A. was having sex with her boyfriend. Mrs. Thibeaux subsequently testified that H.A. told her that she and Mr. Thibeaux did not have sex and that she and her boyfriend had had sex. Ms. Smith then testified that she never told Mrs. Thibeaux that she thought H.A. was having sex with her boyfriend. Cassandra McAlister, the Department of Children and Family Services Child Welfare Specialist assigned to H.A.'s case, also testified that Mrs. Thibeaux told her that H.A.'s counselor had told Mrs. Thibeaux that H.A. was

sleeping with her boyfriend. Prior to closing arguments, the trial court gave the jury the following limiting instruction:

> That evidence or that testimony that came in was some evidence by Ms. McAlister and Ms. Smith, in regards to Ashley Thibeaux's statement in regards to did she ever tell Ms. McAlister that her daughter's therapist informed her that it was just the boyfriend or a boyfriend that she was having sex with.

> That statement and that evidence and testimony is not to be used for any other purpose other than impeachment purposes, only, of a statement or prior inconsistent statement. That is for you to bring to the deliberation room and use that as you see fit, only for impeachment purposes of [Mrs.] Thibeaux's testimony.

Mr. Thibeaux contends the trial court's instruction was untimely as it should have been made at the time the evidence was admitted. Additionally, he argues that, rather than instructing the jurors that it was their duty to decide whether Mrs. Thibeaux's testimony had been impeached, the instruction actually unduly led the jurors to believe that the judge was instructing them to find that her testimony had been impeached.

Regardless of the timeliness of the trial court's instruction or its wording, we find that Mr. Thibeaux fails to show that he was prejudiced by his counsel's failure to object. Even without any instruction at all, we note that the testimony was somewhat confusing. Still Mr. Thibeaux fails to show that the trial court's instruction to the jury substantially affected the jury's evaluation of Mrs. Thibeaux's testimony or that such an instruction would have affected the jury's verdict. Furthermore, considering the physical evidence linking Mr. Thibeaux to the sexual misconduct against H.A., *i.e.*, the DNA and Y-STR profiles, as well as H.A.'s extensive testimony, we find Mrs. Thibeaux's statement, impeached or not impeached, did not have a substantial affect on the jury's decision as to whether

38

Mr. Thibeaux had sex with H.A. Thus, we conclude that Mr. Thibeaux has not proven that his trial counsel was ineffective for failing to ensure the timeliness of the instruction or for failing to object to the wording of the instruction.

For the foregoing reasons, we find this assignment of error lacks merit.

### Double Jeopardy

In his third assignment of error, Mr. Thibeaux contends that his convictions for the three counts of aggravated rape and his convictions for three separate counts of aggravated crime against nature violated his protection against double jeopardy because the evidence admitted at trial was insufficient to discern six separate and distinct acts of sexual intercourse. He asserts that H.A.'s testimony was too vague as to dates, events, and specifics for the jury to sufficiently ascertain what descriptions and details were pertinent to each alleged act of sexual intercourse.

Regarding a similar allegation of double jeopardy, this court elucidated:

> Defendant further argues that because there was no evidence of each individual offense, he was subjected to double jeopardy when he was convicted of five separate offenses based on a single allegation of sexual touching. In *State v. Ramsdell*, 09-1510, pp. 10-11 (La.App. 3 Cir. 10/6/10), 47 So.3d 78, 85, this court discussed double jeopardy, in part, as follows:
>
> > The Double Jeopardy provisions in the state and federal constitutions protect a defendant from both a second prosecution for the same offense and multiple punishments for the same criminal act. U.S. Const. amend. V; La. Const. art. 1, § 15; *State v. Doughty*, 379 So.2d 1088 (La.1980). . . . However, an accused who commits

separate and distinct offenses during the same criminal episode or transaction may be convicted and sentenced for each offense without violating the prohibition against double jeopardy. *State v. Williams*, 05-1338 (La.App. 3 Cir. 3/1/06), 924 So.2d 1159, *writ denied*, 06-1471 (La.12/15/06), 944 So.2d 1284.

Furthermore, Louisiana jurisprudence does not follow the "'same transaction' test which would prohibit prosecutions for different crimes committed during one sequential, continuing course of conduct." *State v. Letell*, 12-180, pp. 7-8 (La.App. 1 Cir. 10/25/12), 103 So.3d 1129, 1137, *writ denied*, 12-2533 (La.4/26/13), 112 So.3d 838. Finally, in Louisiana, double jeopardy fails to protect an offender who violates numerous statutory provisions on a crime spree. *Id.*

Every time Defendant completed the act of touching the victim's vagina or breast, either on the couch or in her bed, over or under her clothes, it was a separate and distinct act, whether it was sexual battery, indecent behavior with a juvenile, or molestation of a juvenile.

*State v. Urena*, 13-1286, pp. 8-9 (La.App. 3 Cir. 5/7/14), 161 So.3d 701, 707, *writ denied*, 14-1603 (La. 4/10/15), 164 So.3d 829.

*Elements of Aggravated Crime Against Nature*

The aggravated crime against nature statute provides, in pertinent part:

A. Aggravated crime against nature is either of the following:

. . . .

(2)(a) The engaging in any prohibited act enumerated in Subparagraph (b) of this Paragraph with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild or any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.

40

(b) The following are prohibited acts under this Paragraph:

(i) Sexual intercourse, sexual battery, second degree sexual battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile or a person with a physical or mental disability, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.

(ii) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.

La.R.S. 14:89.1.

As discussed above, the indictment, in counts four, five, and six, charged Mr. Thibeaux with committing aggravated crimes against nature upon H.A. by having sexual intercourse with her. Counts seven, eight, and nine charged Mr. Thibeaux with committing aggravated crimes against nature upon H.A. by lewdly fondling or touching her. Although the indictment did not set forth the specific conduct upon which each of the aggravated crime against nature charges are based, the State in closing argument explained to the jury the conduct specific to each charge: count one—first anal rape; count two—first vaginal rape with condom; count three—vaginal rape when H.A.'s mother was not home and H.A.

41

had just taken a shower; count four—vaginal intercourse with vaseline; count five—the other time Mr. Thibeaux [had anal intercourse with] H.A.; count six—last rape on June 8, 2015; count seven—molestation in apartment; count eight—oral sex when H.A.'s mother walked in; and count nine—time when Mr. Thibeaux made H.A. grab his penis.

Although Mr. Thibeaux argues that the State failed to prove separate instances of conduct for each offense, he specifically attacks counts four and five, positing that count four is the same as counts two or three. Our review of the record evidence reveals that count four is based on the incident wherein H.A. was in the front room of her house, and Mr. Thibeaux took off her shorts, began "licking" her vagina, and then penetrated her vaginally with his penis. In her video interview, H.A. recalled that Mr. Thibeaux used vaseline. Count two, however, is based on conduct described by H.A. in that same interview as the first time that Mr. Thibeaux vaginally raped her. H.A. described both instances during the same portion of her trial testimony. But she clearly stated that they were two separate encounters differentiated from each other by Mr. Thibeaux's use of a condom in the first vaginal rape and his use of vaseline in the second. Therefore, even though her testimony was confusing, we find that there was sufficient evidence for the jury to conclude two separate acts of conduct—one time being with a condom where H.A. made noises (count two) and another time where Mr. Thibeaux used vaseline (count four). The record further supports the jury's finding that the rape that occurred when Mr. Thibeaux entered her room after she had just showered (count three) was a separate incident from the vaseline conduct charged in count four.

Mr. Thibeaux also contends that count five is the same conduct charged in count one (the first anal rape). The record evidence shows, however,

42

that count five was supported by H.A.'s statement in her Hearts of Hope interview that Mr. Thibeaux had anal sex with her at least one more time other than the conduct asserted in count one. Mr. Thibeaux attacks the credibility of this statement by arguing that it conflicts with H.A.'s trial testimony where she stated that the incident described in count one was the only time Mr. Thibeaux "put his private in [her] butt." Regardless of the credibility of the testimony, which was for the jury to evaluate, there was evidence of two separate incidents of anal rape. Thus, we find the same evidence was not used for both count one and count five. Because the record evidence reasonably supports the jury's finding of nine separate sexual encounters between H.A. and Mr. Thibeaux, we find this assignment also lacks merit.

V.

## CONCLUSION

For the foregoing reasons, we find the evidence was insufficient to find Mr. Thibeaux guilty of all three counts of aggravated rape. However, the evidence is sufficient to find him guilty of forcible rape as to counts one and two and sexual battery as to count three. We, therefore, modify the judgment of the trial court, enter a judgment of conviction as to forcible rape for counts one and two and as to sexual battery for count three, and remand for resentencing. We further affirm the convictions of aggravated crime against nature, vacate Mr. Thibeaux's sentences for aggravated crime against nature, and remand these convictions for resentencing with instruction to the trial court to specify whether the sentences are to be served with or without hard labor. Mr. Thibeaux's claim of ineffective assistance of counsel as to trial counsel's failure to challenge three

43

jurors for cause and failure to exercise peremptory challenges to strike those jurors is hereby relegated to post-conviction relief.

**VERDICT MODIFIED IN PART AND AFFIRMED IN PART; JUDGMENT OF CONVICTIONS ON TWO COUNTS OF FORCIBLE RAPE AND ONE COUNT OF SEXUAL BATTERY ENTERED; SENTENCES VACATED AND REMANDED FOR RESENTENCING.**